**AFFIRM; and Opinion Filed November 29, 2018.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

_____

## No. 05-17-00925-CV
_____

**WILLIE COPELAND, Appellant**

**V.**

**EUGENE WALKER, JR. AND ELSA NIEVES BROWN, Appellees[1]**

**On Appeal from the 192nd Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-14-07548**

# MEMORANDUM OPINION

Before Justices Lang-Miers, Fillmore, and Myers
Opinion by Justice Lang-Miers

After a nonjury trial on appellant Willie Copeland's claims for breach of contract against

appellees Eugene Walker, Jr. and Elsa Nieves Brown, the trial court concluded that "[n]either party

is a prevailing party to this dispute" because both Copeland and Brown breached the contract. The

court also concluded that Copeland's breach excused Brown's performance of the contract. In four

issues, Copeland challenges the trial court's findings of fact and conclusions of law. We affirm.

### BACKGROUND

The following facts are drawn from the evidence viewed in the light most favorable to the

trial court's judgment.

---

[1] Appellant Willie Copeland also named Copeland Concrete & Contracting, Inc. as a party to this appeal. But appellant Copeland, the plaintiff below, nonsuited his claims against Copeland Concrete & Contracting, Inc. prior to trial, and Copeland Concrete & Contracting, Inc. is not a party to the trial court's judgment. The record also reflects that Copeland Concrete & Contracting, Inc. filed for bankruptcy protection in 2015. Consequently, we have not included Copeland Concrete & Contracting, Inc. in the caption or disposition of this appeal.

For over twenty-five years, Copeland was the owner and principal of Copeland Concrete Contractors, Inc. (the "Company"), a concrete contracting company that he founded. The Company completed projects in the Dallas area, including work at the Dallas Convention Center, the Meyerson Symphony Center, and the South Side Waste Treatment Plant. In 2008, however, Copeland began to consider retirement, and sought to find a buyer for the Company. Copeland had met Walker, was impressed by him, and hoped to sell the Company to him. Walker was employed elsewhere, but considered the possibility of purchasing the Company over time to allow for Copeland's eventual withdrawal and retirement.

Walker and Copeland signed a "Purchase Agreement of Copeland Concrete Contractors, Inc." to be effective January 1, 2008, under which Walker would purchase the Company over a five-year period (the "Agreement"). Copeland alleged in his petition that under the Agreement, "Walker agreed to purchase [Copeland's] shares in [the Company] for $200,000.00 together with a payment of a percentage of the profits from the business from 2008 through 2012." Article 3, "Purchase Price and Payment Terms," of the Agreement provided:

> **3.01 Purchase Price.**
> The Buyer agrees to pay the lump sum of two-hundred thousand dollars ($200,000) turn key for the purchase of the corporation. This is equivalent to 490 shares at $408.16 per share or 49% of the Corporation.
>
> **3.02 Payment Terms.**
> The Payment Terms for the purchase price shall be in monthly payments as follow[s]:
>> Three Thousand Thirty Three [sic] dollars and thirty three cents ($3,333.33) per month due no later than the 10th of the month with a final adjustment on the 12th payment of the year to amount to $40,000. No interest applies.
>
> **3.03 Payment Conditions.**
> The Buyer and the Shareholder agree that the payments shall be made from the earnings of the corporation. If the corporation is unable to pay as scheduled, the payment shall be made from the cash reserves of the corporation. If the cash reserves are not available, the payment shall be accrued and deferred until the corporation generates the funding through cost of good[s] sold.

**3.04 Transfer of Shares.**
The transfer of shares shall be determined by the payment plans and applied annually as payments are received by the Seller from the Buyer as per Article 1 above.
. . .

Under Article 5, "General Terms," the Agreement provided, "The payment terms to the Buyer are contingent upon the financial performance of the corporation. The Seller understands fully that the Corporation shall provide the funding for payment. The Buyer and the Seller are therefore both fully committed to the performance of the corporation to fund this Agreement." Article 5.2, "Compensation for the Buyer," provided that "The Buyer intends to be employed by the corporation and be compensated by the corporation. This transition will only take place after the corporation is able to sustain a salary from the earnings of the corporation." Article 5.5, "Deferred Payments," provided that "The Seller understands that if the corporation is not able to sustain the monthly payment, the payments will be deferred and paid as the corporation earns the funds from work in progress." The Agreement also reflects that as of December 31, 2007, the Company had no work in progress and no pending contracts.

Walker concluded that he was not in a position to purchase the Company, and Copeland continued to operate the Company in 2008 and 2009. At trial, the parties offered conflicting testimony whether Copeland or Walker held a majority of the Company's shares between 2008 and 2010. Copeland testified that he transferred 51% of the Company's shares to Walker, while Walker testified that he never became the majority owner of the Company. Brown testified at trial that for the years 2008 and 2009, Copeland was shown as the 100 percent owner of the Company on its tax returns, and the Company's application to obtain certification as a minority-owned business showed Copeland as the owner.

Brown, a civil engineer and architect, testified that she owned her own company in 2008. She lived and worked in San Antonio. Walker introduced Brown to Copeland when Brown was

seeking minority contractors to fulfill one of her company's contracts. Brown and Copeland worked together on one of Brown's contracts in San Antonio. Brown also began to assist Copeland to "bring the [C]ompany into a digital format because everything was on paper files," and in 2009, she began serving as project manager on the Company's project for the DART blue line, a 4.8 mile extension of the DART rail line between Garland and Rowlett. The project was "by far the largest contract ever performed by Copeland Concrete," according to Brown. She worked long hours on the job site, coordinating "seven or eight subcontractors" and ten "major suppliers," and handling the project's finances. When Walker asked her to "take over" the Agreement to buy the Company, she "jumped at the opportunity" because she "felt it would be a good opportunity for me to grow as a business owner, and I was very vested by that time" in the DART project. Copeland gave "an immediate yes," and the parties met to finalize their agreement.

Copeland, Walker, and Brown signed "Amendment No. 1" to the Agreement, effective January 1, 2010. The parties agreed that "[t]he Buyer shall be changed from Eugene Walker Jr. to Elsa I. Nieves Brown." Brown agreed to all terms and conditions of the Agreement. The parties also agreed that if Brown did not meet the Agreement's financial obligation by December 31, 2013, Walker "shall have the first right of refusal to purchase the corporation, under the original Purchase Agreement."

Brown paid $63,000 toward the $200,000 purchase price between January 2010 and February 2014. She gave detailed testimony regarding the Company's finances, on which the Agreement's payment terms depended. She testified that in 2010 and 2011, the Company did not have cash reserves for distributions to the owners. In 2012, the Company suffered losses arising from disputes on two projects and a write-off on a third. To make the Company's payroll, Brown borrowed money on a revolving line of credit that she personally guaranteed. She was still making payments on the loan at the time of trial. In summary, she testified:

Q. From what you've said so far and given the financial condition of the company, did this company have money to pay Mr. Willie Copeland?

A. No, we did not.

Q. If there was no money to pay Mr. Willie Copeland, what was it in the contract that you guys agreed you would do in terms of paying him?

A. I would pay as the company had the ability by its own reserves, its own earnings. And the last payment I made to him was on 2/28/14 for $10,000.

The Agreement required Copeland to convey certain property to the Company, including a building on Stella Avenue in Dallas used for the Company's business (the "Property"). Copeland transferred the Property to the Company by warranty deed recorded in February, 2008. But on November 26, 2013, without informing Brown, Copeland conveyed the Property to the "Willie Copeland Family Trust." Copeland testified that he made the transfer after he drove by the Property and observed a sheriff seizing Company property. He stopped and asked the sheriff the reason for the seizure, and testified he was told that Brown had not paid a contractor who had "done some work for her." When Brown went to the courthouse to pay the Company's property taxes in February 2014, she learned that the Company no longer owned the Property. Brown made no further payments to Copeland after February, 2014.

In May, 2014, Copeland's attorney sent letters to Walker and Brown demanding payment of $366,000 that Copeland claimed to be due to him under the Agreement. Walker and Brown did not pay the amount demanded, and Copeland filed this suit on July 16, 2014. At a nonjury trial in June, 2017, the trial court heard testimony from Copeland, Walker, and Brown. Copeland's accountant also testified, and his attorney offered evidence of his fees. The trial court rendered judgment on July 6, 2017, and made findings of fact and conclusions of law on July 18, 2017. Copeland filed a motion for new trial that was overruled by operation of law. This appeal followed.

## STANDARD OF REVIEW

The trial court's findings of fact following a bench trial have the same weight as a jury's verdict. *Inwood Nat'l Bank v. Wells Fargo Bank, N.A.*, 463 S.W.3d 228, 234 (Tex. App.—Dallas 2015, no pet.). We review the trial court's findings for legal and factual sufficiency of the evidence under the same standards as are applied to review of jury verdicts. *Id.* In conducting a legal sufficiency review, we must determine whether the evidence would enable the factfinder to reach the determination under review. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). We will not disturb a finding for factual insufficiency unless the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and manifestly unjust. *Inwood Nat'l Bank*, 463 S.W.3d at 234–35. We defer to unchallenged findings of fact that are supported by some evidence. *Id.* at 235. However, the trial court has no discretion in determining what the law is or applying the law to the facts. *Id.* Accordingly, we review the trial court's conclusions of law de novo. *Id.* We will uphold the trial court's judgment, even if we determine a conclusion of law is erroneous, if the judgment can be sustained on any legal theory supported by the evidence. *Id.*

## DISCUSSION

In four issues, Copeland challenges the legal and factual sufficiency of the evidence to support the trial court's judgment. Specifically, he challenges the legal and factual sufficiency of the evidence to support the trial court's finding of fact that he failed to convey the Property to the Company as required under the Agreement. He argues that the evidence establishes the opposite finding, that he did convey the Property. And he contends that the trial court erred in its conclusion of law that his failure to perform his obligations under the Agreement discharged Brown from her obligation to pay the entire purchase price.

**A. Discharge of contractual obligations**

In his first and fourth issues, Copeland challenges the trial court's conclusion of law that "Copeland's failure to perform his obligations to transfer the Property and his Company ownership to Brown discharged Brown from her obligation to pay the entire purchase price," and its finding of fact that Copeland failed to transfer the Property and his remaining ownership in the Company to Brown. Copeland argues the evidence is undisputed that Walker did not make any payments under the Agreement in 2008 or distribute any share of the Company's profits to Copeland. He argues that Walker's failure to pay was a prior material breach excusing Copeland from further performance. He argues that he "complied with every aspect of this contract until December 31, 2008, when he did not transfer shares to Walker." And he contends that because Walker failed to make any payments in 2008, his failure to transfer shares in December 2008 was excused.

Copeland contends that Brown and Walker bore the burden to establish their affirmative defense that they were excused from performance of the Agreement by Copeland's material breach. *See Blackstone Med., Inc. v. Phoenix Surgicals, L.L.C.*, 470 S.W.3d 636, 646 (Tex. App.—Dallas 2015, no pet.) (contention that party to contract is excused from performance because of prior material breach by other contracting party is affirmative defense). He concedes that when one party commits a material breach of a mutually dependent, reciprocal promise in a contract, the other party is discharged or excused from further performance. *See Mustang Pipeline Co., Inc. v. Driver Pipeline Co., Inc.*, 134 S.W.3d 195, 196 (Tex. 2004) (per curiam) ("It is a fundamental principle of contract law that when one party to a contract commits a material breach of that contract, the other party is discharged or excused from further performance."); *see also Dallas Mkt. Ctr. v. The Swing, Inc.*, 775 S.W.2d 838, 842 (Tex. App.—Dallas 1989, no writ) ("In Texas, the general rule is that reciprocal promises in a contract, absent intentions to the contrary, are presumed to be mutually dependent and the breach of one will excuse performance of the other.").

He also concedes that whether a breach is material is a question of fact, *see Bartush-Schnitzius Foods Co. v. Cimco Refrigeration, Inc.*, 518 S.W.3d 432, 436 (Tex. 2017) (per curiam), and does not challenge the sufficiency of the evidence to support the trial court's implied finding that his breach was material. But he argues that even a material breach would not discharge obligations that arose under the Agreement prior to the breach. *See id.* at 437.

The trial court found that Walker "agreed to pay Copeland $200,000 for the Company," and included in its finding of fact the Agreement's provision that "if the Company's cash reserves were unavailable, payment would be accrued and deferred until the Company generated the funding through the cost of goods sold." Although Copeland offered evidence through the testimony of his accountant that the Company had sufficient funds for Walker to make the contractual payments, Brown testified in some detail to the contrary. The trial court was the sole judge of the credibility of the witnesses and the evidence. *See Rich v. Olah*, 274 S.W.3d 878, 884 (Tex. App.—Dallas 2008, no pet.) ("In a bench trial, the trial court is the sole judge of the credibility of the witnesses, assigns the weight to be given their testimony, may accept or reject all or any part of their testimony, and resolves any conflicts or inconsistencies in the testimony."). We may not substitute our judgment for that of the trier of fact, even if a different answer could be reached upon review of the evidence. *See id.*

We conclude the evidence was factually sufficient to support the trial court's finding that both parties breached the Agreement, and the finding is not so against the great weight and preponderance of the evidence that it is clearly wrong and manifestly unjust. *Inwood Nat'l Bank*, 463 S.W.3d at 234–35. We also conclude that the trial court did not err by ruling that the parties made, and breached, dependent promises under the Agreement. *See Mustang Pipeline Co.*, 134 S.W.3d at 196. We decide Copeland's first and fourth issues against him.

**B. Copeland's breach of the Agreement**

In his second and third issues, Copeland argues that there was undisputed evidence that he conveyed the Property to the Company in 2008 as required by the Agreement, and that his conveyance of the Property in 2008 was in substantial compliance with the requirements of property code section 5.022(c). *See* TEX. PROP. CODE ANN. § 5.022 (form to convey fee simple estate in real property with covenant of general warranty). He contends that in light of this undisputed evidence, the trial court erred as a matter of law by finding that he failed to convey the Property.

The evidence is also undisputed, however, that Copeland conveyed the Property back to his "family trust" in November 2013. This conveyance provides sufficient factual support for the trial court's finding that Copeland failed to transfer the Property as the Agreement required. Shortly thereafter, Brown ceased making payments to Copeland under the Agreement. The trial court concluded that Copeland's obligation to transfer the Property and his ownership in the Company, and Brown's obligation to pay the purchase price, were dependent promises. The trial court's finding is not so against the great weight and preponderance of the evidence that it is clearly wrong and manifestly unjust. *Inwood Nat'l Bank*, 463 S.W.3d at 234–35. We conclude the trial court did not err by finding that Copeland failed to transfer the Property to Brown. We decide Copeland's second and third issues against him.

## CONCLUSION

We affirm the trial court's judgment.


/Elizabeth Lang-Miers/
_____
ELIZABETH LANG-MIERS
JUSTICE

170925F.P05



## Court of Appeals
## Fifth District of Texas at Dallas
# JUDGMENT

WILLIE COPELAND, Appellant

No. 05-17-00925-CV          V.

EUGENE WALKER, JR., AND
ELSA NIEVES BROWN, Appellees

On Appeal from the 192nd Judicial District
Court, Dallas County, Texas
Trial Court Cause No. DC-14-07548.
Opinion delivered by Justice Lang-Miers;
Justices Fillmore and Myers, participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

It is **ORDERED** that appellees Eugene Walker, Jr., and Elsa Nieves Brown recover their costs of this appeal from appellant Willie Copeland.

Judgment entered this 29th day of November, 2018.